IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 18-CR-4011-LTS |
| vs. | **REPORT AND RECOMMENDATION** |
| RAUL FLORES MARIN, | |
| Defendant. | |

_____

This matter is before the court on Defendant Raul Flores Marin's motions to suppress evidence. Docs. 26, 28. In one motion, Marin seeks to suppress evidence seized and statements made after a traffic stop in the early morning of July 19, 2017, arguing that no reasonable suspicion or probable cause existed to stop his vehicle, that the traffic stop was unreasonably prolonged, and that questioning at the scene of the traffic stop violated *Miranda v. Arizona*, 384 U.S. 436 (1966). Doc. 29. In another motion, Marin argues that *Miranda* requires suppression of statements he made after his arrest on a federal warrant on March 1, 2018, as well as any evidence seized from his residence that same day pursuant to a search warrant obtained as a result of his unwarned statements. Doc. 27. In a supplemental brief submitted after the hearing, Marin additionally argued that officers violated the Fourth Amendment when they seized cell phones from his vehicle after his arrest on March 1. Doc. 38. The United States (the Government) resists the motion related to the July 19, 2017 incident, as well as that part of the other motion seeking suppression of evidence seized from Marin's residence pursuant to a search warrant. Doc. 30. The Government concedes that the cell-phone evidence seized and statements made March 1, 2018, should be suppressed. Doc. 30 at 29; Doc. 39 at 3. I recommend **denying** the motion to suppress related to the July 19, 2017 stop (Doc. 28) and **granting in part and denying in part** the motion related to the

March 1, 2018, arrest (Doc. 26), suppressing only that evidence the Government concedes should be suppressed.

## I. PROCEDURAL HISTORY

On February 21, 2018, the grand jury return a sealed indictment charging Marin with possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Doc. 2. A warrant issued for Marin's arrest (Doc. 3), and he was arrested on March 1, 2018. His initial appearance and arraignment took place in this court the next day. Doc. 7. The court originally scheduled trial for the two-week setting beginning on May 7, 2018, which was later continued (on Marin's unresisted motion) to the two-week setting beginning on July 2, 2018. Docs. 12, 24. Marin filed the motions to suppress on April 27, 2018, and the Government filed its resistance on May 3, 2018. Docs. 26-30

I conducted an evidentiary hearing on the suppression motions on May 30, 2018. Doc. 36. The Government presented testimony from Deputy Caleb Edwards and Sergeant Matt Julius,[1] both with the Osceola County, Iowa Sheriff's Office, and from Buffalo Ridge, Minnesota, Drug Task Force Agent Shawn Elsing. Doc. 36. The Government also submitted, and I admitted, 16 exhibits, including video footage of the July 19, 2017, traffic stop. Doc. 36; *see also* Doc. 30 at 2-3. I admitted one exhibit submitted by Marin. Doc. 36. After the hearing, the parties submitted supplemental briefing (on June 8 and 10, 2018) on the issue of the seizure of evidence from Marin's vehicle after his arrest on March 1, 2018. Docs. 38, 39.

---

[1] In July 2017, the relevant time period, Sergeant Julius had not yet been promoted to sergeant and was still a deputy. I thus refer to him as Deputy Julius throughout this opinion.

During the suppression hearing, the parties made a joint motion to continue trial, which I granted. Docs. 36-37. Trial is now scheduled for the two-week setting beginning on September 4, 2018. Doc. 37.

## II. RELEVANT FACTS[2]

### A. July 19, 2017

Sometime after 2:40 a.m. on July 19, 2017, the Osceola County, Iowa Sheriff's Office received an emergency call from Jerry Sievert. Sievert reported a suspicious vehicle, a pickup truck with Minnesota plates,[3] parked in the middle of his yard. He said that he did not know who it was and that nobody had gotten out of the vehicle yet, but they were backing up further onto his property. Ex. 1A. Dispatch sent Deputy Edwards to investigate. Dispatch first provided the incorrect address, a location in the small town of Sibley, Iowa, within minutes of the Sheriff's Office, and Deputy Edwards arrived at the incorrect address around 2:48 a.m. When Deputy Edwards learned that the reporting party was Sievert, he knew the location of the residence (approximately six to seven miles away), as he had been to Sievert's residence in rural Osceola County a few weeks before to investigate another report of a suspicious vehicle.[4] Deputy Edwards also knew that around a month ago, Sievert had reported a burglary of firearms and ammunition from his residence during the daytime.

---

[2] Unless noted otherwise, the information in this section comes from testimony provided at the suppression hearing and the video and audio exhibits.

[3] Osceola County shares its northern border with Minnesota, and Deputy Edwards testified it was not unusual to see vehicles with Minnesota plates.

[4] The prior report involved a silver or tan Buick Century parked in Sievert's yard around 5:00 a.m. with three people inside. Doc. 33. Sievert reported that the driver got out of the vehicle, yelled at Sievert through his kitchen window that he wanted to talk to him, and left when Sievert said he was calling the Sheriff. *Id.*

3

Deputy Edwards headed to Sievert's residence. He could have taken one of two roads to get to Sievert's residence from town, and he chose to take Nettle Avenue, a gravel road that, like all gravel roads that I am aware of, did not have marked lanes.[5] At 2:53 a.m., when he was still about two miles away from Sievert's residence, Deputy Edwards encountered a Ford F-150 truck traveling northbound on Nettle Avenue (away from the location of the Sievert residence) as he drove southbound (toward the Sievert residence). It was the first vehicle Deputy Edwards had encountered since leaving the Sheriff's Office. As the truck passed, Deputy Edwards slowed and noted it had Minnesota plates. Because the vehicle matched the description of the one Sievert had reported, Deputy Edwards turned around to follow the truck. Deputy Edwards testified that shortly after he began following the truck, it veered onto the left-hand side of the gravel road, almost into the ditch (the dash-camera video is too far away and dark to clearly capture whether the truck was in any danger of leaving the road, although the truck does appear to be traveling on the left-hand side of the road (Ex. 9, 2:53:45-2:54:13)). When Deputy Edwards caught up to the truck (about a mile away from when he first saw the truck), he initiated a traffic stop using his flashing lights. He radioed dispatch Marin's license plate number to run a search.

Deputy Edwards approached the truck and asked the driver, later identified as Marin, what he was up to. Ex. 9, 2:54:48. Marin responded that he was looking for his friend Clint who had sold him a trailer, and he needed the title (although Deputy Edwards misunderstood and believed Marin had been looking for the trailer itself). Deputy Edwards requested Marin's driver's license, registration, and insurance and asked Marin to accompany him to his squad car. As Marin was walking to the car, Deputy Edwards asked if Marin had any knives or guns on his person, and Marin responded

---

[5] Deputy Edwards testified that it is common to drive down the middle of gravel roads like Nettle Avenue, moving to the right side of the road only when there is oncoming traffic.

(jokingly) something to the effect of "not unless you give me yours." Ex. 9, 2:57:59. Deputy Edwards asked again if Marin had any weapons, and Marin responded in the negative. Deputy Edwards requested to pat Marin down, and after he had patted both of Marin's pockets and was checking lower on his person, Marin told him that he had a Swiss army knife in his pocket (which Deputy Edwards confiscated along with a lighter).

Once they were in the squad car, Marin asked what Deputy Edwards was doing on Nettle Avenue, as there were not usually law enforcement officers around. Ex. 9, 2:59:40. Deputy Edwards told Marin that he had been called in as a suspicious vehicle when he had been looking for the trailer at the house "back there." Ex. 9, 3:00:04. Marin clarified that he had been looking for the title to the trailer, not the trailer itself. Deputy Edwards responded that either way, Marin had been on Sievert's property when he was not supposed to be, and Sievert had called the Sheriff's Office and given a description of Marin's vehicle.

Around this time, dispatch informed Deputy Edwards that the burglary alarm at a local gas station had been triggered. Because Deputy Edwards was otherwise occupied with Marin and the only officer on duty, he told dispatch to call Deputy Julius to respond to the alarm. Deputy Edwards testified that he recommended dispatch contact Deputy Julius because he is a certified Drug Recognition Expert (DRE), and Deputy Edwards[6] believed Marin may have been impaired based on his observations of Marin and his excited and fast speech. Deputy Edwards asked Marin about past and current drug use, and Marin admitted to using marijuana once many years ago, but he denied any other drug use. Deputy Edwards then obtained Marin's consent to take his pulse. Marin indicated he suffered from high blood pressure, so Deputy Edwards asked Marin his typical heart rate. Marin said that three years ago, it had been 180 to 190 beats per

---

[6] Deputy Edwards testified he has completed training to recognize indicators for possibly impaired drivers.

minute, but he now took medication. Deputy Edwards informed Marin that he had measured his pulse at 120 to 125 beats per minute, and Marin said it was usually higher, around 140 to 145 beats per minute.

Deputy Edwards told Marin that he had seen him "going off to the left side of the road" earlier. Ex. 9, 3:08:20. Marin explained that he had been "scared of the cop." Deputy Edwards asked if Marin had thrown something out of the front driver-side window and into the left-side ditch. Marin said no and that the first thing he did when he noticed the squad car following him was to check his speed. Deputy Edwards radioed Deputy Julius for assistance and told Marin that because his pulse was high, he had called a drug recognition expert to the scene to ensure Marin was not intoxicated. While Deputy Edwards waited for Deputy Julius to arrive, he moved Marin to the back of the squad car, but told him he was not under arrest and did not place him in handcuffs. Deputy Edwards then searched that part of the ditch near where Marin had been driving on the left-hand side of the road earlier, looking for anything Marin might have tossed out of the window. He did not find anything, but the darkness and tall grass and corn made it difficult to search. He went back to the squad car to wait and talked further with Marin about Sievert and the trailer. Marin indicated he was unsure why Sievert had reported him as a suspicious vehicle because he had been to the residence several times before. At some point, Deputy Edwards shut his vehicle off because he was low on gas and worried about running out (although he ensured that the dashboard camera was still recording).[7]

---

[7] Deputy Edwards testified that at some point after he stopped Marin, dispatch relayed that Sievert had called back with an update: the pickup truck had left his residence and was traveling on Nettle Avenue, the same road Marin had been traveling on. It is unclear from the record when Sievert called with this information (e.g., before or after the traffic stop) and when precisely it was communicated to Deputy Edwards.

When Deputy Julius arrived (about twenty minutes after Deputy Edwards had radioed him and thirty-five minutes after the initial stop), one of the first things he asked Marin was whether he had anything illegal in his vehicle. Marin said he had a loaded handgun in the backseat under an article of clothing. Deputy Julius found the firearm where Marin had said it would be (at the same time, Deputy Edwards checked under the passenger seat for firearms and recovered nothing). Deputy Julius checked the serial number of the firearm to see if it was stolen (it was not). Deputy Edwards asked Marin whether he had a permit to carry the firearm, and he did not. Deputy Edwards placed Marin under arrest and took him to jail.[8]

Deputy Julius stayed at the scene with Marin's vehicle and waited for a tow truck. Deputy Julius began the inventory process and found methamphetamine, a large amount of cash ($1,240), and cell phones. The tow truck arrived and took Marin's vehicle to a secure garage, where Deputy Julius completed the inventory. *See* Ex. 6, Doc. 33-4.

### B. March 1, 2018

Agent Elsing stopped Marin while he was driving on March 1, 2018, and arrested him pursuant to a warrant. He seized phones and other evidence from Marin's vehicle after his arrest. Prior to reading his *Miranda* rights, Agent Elsing asked Marin whether he had any drugs at his house. Marin said that he had a methamphetamine pipe in his barn. Based on this statement, Agent Elsing obtained a search warrant for Marin's barn and residence. Ex. 15, Doc. 33-8. As a result, Agent Elsing recovered the methamphetamine pipe and acquired photographs.

---

[8] At the jail Deputy Julius conducted testing to determine whether Marin was impaired.

## III. DISCUSSION

The Government does not resist suppression of Marin's statements made after his arrest on March 1, 2018, nor suppression of evidence seized from his vehicle that day. The parties do dispute, however, whether reasonable suspicion or probable cause existed for the initial traffic stop on July 19, 2017; whether that traffic stop was unreasonably prolonged; whether Deputy Edwards' questioning of Marin during the traffic stop violated *Miranda*; and whether the methamphetamine pipe and photographs obtained on March 1, 2018, should be suppressed as the fruits of a *Miranda* violation.

### A. Initial Traffic Stop

Marin challenges the initial stop of his vehicle. The Government argues that Deputy Edwards could stop Marin to investigate Sievert's call of a suspicious vehicle on his property, as well as based on his observations of Marin driving on the left-hand side of the gravel road once Deputy Edwards turned around to follow him.

"A traffic stop 'must be supported by reasonable suspicion or probable cause.'" *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) (quoting *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008)). "Any traffic violation, however minor, provides probable cause for a traffic stop." *Id.* (quoting *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008)). The Fourth Amendment also "permits investigative traffic stops [under *Terry v. Ohio*, 392 U.S. 1 (1968)] when law enforcement has reasonable suspicion of criminal activity." *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017) (quoting *United States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016)). "To establish reasonable suspicion, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' further investigation." *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016) (quoting *Terry*, 392 U.S. at 21). Reasonable suspicion requires

8

"some minimal level of objective justification" of criminal activity that is "more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984); *Terry*, 392 U.S. at 27) (internal quotation marks omitted). "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). The officer "need not rule out the possibility of innocent conduct." *Id.* at 277. Courts must consider "the totality of the circumstances," rather than analyzing the suspiciousness of each factor in isolation. *Id.* at 274, 277.

Here, Deputy Edwards had reasonable suspicion that Marin's vehicle had been the one on Sievert's property. "When a traffic stop is based on a radio dispatch, factors such as 'the temporal and geographic proximity of the car to the scene of the crime, [a] matching description of the vehicle, and the time of the stop' are highly relevant to a finding of a reasonable suspicion." *United States v. Daniel*, 887 F.3d 350, 354 (8th Cir. 2018) (quoting *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998)). Within thirteen minutes of Sievert reporting a suspicious vehicle on his property, Deputy Edwards encountered Marin two miles away from Sievert's property and traveling in the opposite direction. Marin's vehicle was the first Edwards had seen since leaving the Sheriff's Office—it was the middle of the night, and they were in rural Iowa—and it matched the description given by Sievert of a pickup truck with Minnesota plates. The location of Marin's vehicle in relation to Sievert's residence, Sievert's description of the vehicle, and the time of the stop all support a finding of reasonable suspicion that Marin's vehicle had trespassed on Sievert's property. *See* Iowa Code § 716.7(2)(a)(1) (defining trespass as "[e]ntering upon . . . property without the express permission of the owner . . . with the intent to commit a public offense [or] to use, remove therefrom, alter, damage, harass, or place thereon . . . anything animate or inanimate").

9

Criminal trespass is a misdemeanor under Iowa law. Iowa Code § 716.8(1) ("Any person who knowingly trespasses upon the property of another commits a simple misdemeanor punishable [by fines]. A peace officer . . . may arrest the person . . . if the person refuses to leave the property after receiving a citation or immediately returns to the property after receiving a citation, or . . . as otherwise provided under law."). The Eighth Circuit has recognized that "the Supreme Court has never decided whether *Terry* stops are justified by a need to investigate previous misdemeanors (or lesser violations)" and that at least one circuit (the Sixth) has "state[d] that police may not make a stop on reasonable suspicion of a 'mere completed misdemeanor.'" *United States v. Hughes*, 517 F.3d 1013, 1017 (8th Cir. 2008) (quoting *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004)). Here, when Deputy Edwards encountered Marin's vehicle, the trespass had already been completed, and Deputy Edwards did not personally witness Marin's vehicle trespassing on Sievert's property. In *Hughes*, however, the Eighth Circuit rejected any bright-line rule regarding the constitutionality of *Terry* stops to investigate past misdemeanors, instead employing a balancing test like the Ninth and Tenth Circuits. *Id.* at 1017. "[T]he nature of the misdemeanor and potential threats to citizens' safety are important factors." *Id.* Other factors include the nature of the governmental intrusion ("*Terry* stops of vehicles along public roads are intrusions on an individual[']s liberty interest, but are considerably less invasive than a 'frisk on a public corner'") and available alternatives to a *Terry* stop (such as a consensual encounter or observing the individual for other indications of criminality). *Id.* at 1018 (quoting *United States v. Wheat*, 278 F.3d 722, 737 (8th Cir. 2001)).

Employing this balancing test, the Eighth Circuit concluded in *Hughes* that the governmental interest in investigating misdemeanor trespass under Missouri law did not outweigh the defendant's liberty interest based on the facts of that case, although the court recognized that "[t]here may be cases where a *Terry* stop is justified to investigate

10

completed trespass." *Id.* at 1018. In *Hughes*, an anonymous caller reported (at 9:30 in the morning) "suspicious parties on the property" of an apartment complex in a high-crime area known for drug trafficking. *Id.* at 1015. The caller gave a description of the two suspicious individuals, and when an officer arrived on the scene, he saw two men that matched the caller's description (along with a woman) standing at a bus stop across the street from the apartment complex. *Id.* The officer stopped and frisked the individuals. *Id.* The court assumed that the caller's information established that the described individuals were trespassing. *Id.* at 1017 & n.1. But the court found that a stop and frisk was not warranted to investigate the completed trespass, as nothing in the dispatch indicated the trespassers posed a danger, and the officers did not observe any additional suspicious behavior from the individuals at the bus stop. *Id.* at 1018. The court distinguished cases where "there were multiple reports of the same individual trespassing (two on that particular day), the individual was likely armed as he was trespassing to reach hunting grounds, there were previous confrontations between the trespasser and the property owner, and the trespasser had threated other local property owners," *id.* (citing *United States v. Moran*, 503 F.3d 1135, 1142-43 (10th Cir. 2007), and where the "property owner reported juvenile trespassing, acting weird as if on drugs or d[r]unk, and then running into the woods," *id.* (citing *Bates v. Chesterfield Cnty., Va.*, 216 F.3d 367, 371 (4th Cir. 2000)).

Here, the facts surrounding the trespass implicate a greater risk of danger than at issue in *Hughes*: although Sievert's report of the trespass itself did not suggest any threat to safety, Deputy Edwards knew that a previous trespass on Sievert's property in the middle of the night (albeit involving a different vehicle) had resulted in the driver of the vehicle shouting at Sievert to exit his residence, and Deputy Edwards also knew that firearms had recently been burglarized from Sievert's property. More importantly, unlike in *Hughes*, Deputy Edwards personally observed suspicious behavior. When

11

Deputy Edwards turned around to follow the vehicle, he saw it move to the left-hand side of the gravel road and drive on the left for a few seconds. Iowa law requires "[a] vehicle . . . be driven upon the right half of the roadway upon all roadways of sufficient width," even gravel roads. Iowa Code § 321.297;[9] s*ee also Craft v. United States*, 666 F. Supp. 1302, 1304 (S.D. Iowa 1987) (applying section 321.297 to gravel roads in negligence case); *Bannon v. Pfiffner*, 333 N.W.2d 464, 469 (Iowa 1983) (noting that section 321.297 used to apply only to city driving, but was changed to apply to rural areas as well); *State v. Miller*, No. 03-0298, 2004 WL 140682, at *1 (Iowa Ct. App. Jan. 28, 2004) (suggesting that defendant violated section 321.297 when he drove on the left-hand side of a gravel road). Moreover, Deputy Edwards thought the timing of Marin's driving on the left-hand side of the road suspicious, since it began as soon as a marked squad car turned around to follow him; Deputy Edwards thought it possible that Marin was attempting to throw something out of the front driver-side window and into the ditch to avoid being discovered with contraband by a police officer. Here, considering the totality of the circumstances—(1) that Sievert had reported an unauthorized pickup truck with Minnesota plates on his property; (2) that Deputy Edwards encountered Marin's vehicle in close temporal and physical proximity to the scene, traveling away from Sievert's residence, in a rural area in the middle of the night when no other vehicles were around; (3) that Marin's vehicle matched the description given by Sievert; (4) that Sievert had reported a different suspicious vehicle on his property about a month ago, which had

---

[9] Neither the Government nor Deputy Edwards cite this provision of Iowa law, but the Eighth Circuit has recognized that "a state trooper has probable cause to make a traffic stop even if he does not cite to the proper statute . . . at the time he makes the stop" or at the suppression hearing. *United States v. Demilia*, 771 F.3d 1051, 1054-55 (8th Cir. 2014). Deputy Edwards believed Marin's driving on the left-hand side of the road constituted careless driving under Iowa law, which requires "the vehicle to unnecessarily turn abruptly or sway." Iowa Code § 321.277A(4). As I find section 321.297 applicable, I do not address whether Marin's driving on the left-hand side of the road amounted to careless driving.

12

resulted in a confrontation between Sievert and the driver of the vehicle; (5) that in a separate incident about a month ago, firearms and ammunition had been burglarized from Sievert's property; and (6) that Marin's vehicle began driving on the left-hand side of the gravel road near the ditch as soon as Deputy Edwards began following him in a marked squad car—Deputy Edwards had reasonable, articulable suspicion to stop Marin's vehicle and investigate further. *See United States v. Noonan*, 745 F.3d 934, 936 (8th Cir. 2014) (holding that reasonable suspicion to stop the defendant's vehicle existed based on the defendant's driving fifteen miles below the speed limit, his evasive maneuvers attempting to put distance between his vehicle and a marked squad car, that it was the middle of the night, and that they were near a storage shed when there had been "a rash of recent burglaries" of storage sheds).[10]

### B. Length of the Stop

Marin argues that Deputy Edwards unreasonably prolonged the stop by asking drug-related questions that were outside the scope of the stop. "'[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures,' because a 'seizure remains lawful only so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *United States v. Mosley*, 878 F.3d 246, 253 (8th Cir. 2017) (second alteration in original)

---

[10] The Government also argues that Deputy Edwards had reasonable suspicion that Marin was operating his vehicle while intoxicated. Although Deputy Edwards developed concerns about Marin's sobriety after interacting with him, as will be discussed, he did not appear to have such concerns prior to stopping him, and I do not find he had reasonable suspicion to stop Marin on this basis. The Government also suggests that Marin's driving could constitute a failure to yield, which applies only when vehicles "meet[] each other on" the road, Iowa Code § 321.298; or a lane violation, which requires "three or more clearly marked lanes," Iowa Code § 321.306. Accordingly, I do not find that Marin's driving on the left-hand side of the gravel road amounted to violations of these sections of Iowa law.

13

(quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1612, 1615 (2015)). "An officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention, if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008).

Here, Deputy Edwards initially stopped Marin to investigate Sievert's report of a vehicle trespassing on his property, as well as Marin's driving on the left-hand side of the road. Deputy Edwards' initial questioning aligned with these purposes. As he spoke with Marin, Deputy Edwards observed Marin's odd mannerisms and fast speech, and I fully credit Deputy Edwards' testimony that based on his training, Marin's speech and mannerisms were consistent with drug use. Deputy Edwards also heard Marin's bizarre explanations of his behavior—for example, that Marin was on Sievert's property at 2:45 a.m. to look for the title to a trailer he had purchased from a third party. In addition, Deputy Edwards had earlier observed Marin driving on the left-hand side of the road (almost into the ditch) when Deputy Edwards turned around to follow him. Deputy Edwards thought Marin's driving further indicative of drug use—Marin could have been intentionally driving on the left to attempt to dispose of drugs, or he could have been unintentionally driving on the left because of intoxication. Deputy Edwards had reasonable suspicion to extend the stop to ask Marin about drug use and for consent to take his pulse. Marin's pulse was unusually high, consistent with drug use.[11] Deputy Edwards asked Marin why he had been driving on the left-hand side of the road, and Marin could not give a satisfactory explanation (he said he was scared of cops). These

---

[11] Although Marin indicated that he suffers from high blood pressure, this does not detract from Deputy Edwards' finding that Marin's high heart rate could indicate drug use: Marin did not tell Deputy Edwards his typical heart rate (other than it had been 180 to 190 beats per minute three years ago, prior to medications) until after Deputy Edwards had taken his pulse and told him his results were high.

14

inquiries did not dispel Deputy Edwards' suspicions about Marin's drug use, and he called Deputy Julius to the scene to perform a DRE examination on Marin. When Deputy Julius arrived, Marin had been detained for a total of about thirty-five minutes. Under the totality of the circumstances, reasonable suspicion existed to extend the stop, and the stop was not unreasonably prolonged.

### C. Questioning During the Stop

Marin argues that Deputy Edwards' questioning of Marin during the traffic stop—particularly, asking whether Marin had any weapons prior to conducting a *Terry* pat-down search and whether Marin used drugs as he sat in the squad car with Deputy Edwards—amounted to custodial interrogation and as such, required Deputy Edwards to read Marin his *Miranda* rights. Although a person detained during a traffic or *Terry* stop "is not free to leave . . . until the completion of a reasonably brief investigation, which may include limited questioning," such stops do not usually render the detainee "in custody" for purposes of *Miranda*. *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003). The relevant inquiry is whether the suspect's "freedom of action is curtailed to a 'degree associated with formal arrest.'" *United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir. 1995) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). Marin cites to no caselaw to support that his freedom was so restricted. Although Deputy Edwards questioned Marin in his squad car, Marin was not handcuffed, and prior to searching the ditch (when Marin was moved to the back of the squad car), Deputy Edwards explicitly told Marin he was not under arrest. Marin's detention did not amount to a formal arrest, and *Miranda* warnings were thus not required. *See Pelayo-Ruelas*, 345 F.3d at 590 (holding that when defendant informed agent he was not in the country legally, and the officer asked the defendant to step out of the car and conducted a *Terry* pat-down search of defendant's person, he was not in custody for

15

purposes of *Miranda*); *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (holding that when officer stopped defendant for speeding and asked him to sit in the squad car while the officer wrote the ticket, the defendant was not in custody for purposes of *Miranda); Johnson*, 64 F.3d at 1125-26 (holding that when the officer made a pretextual traffic stop of defendant and asked him to sit in the back of the squad car while he ran his information, consistent with policy due to the defendant's lack of driver's license, the defendant was not in custody for purposes of *Miranda*).

### D. Methamphetamine Pipe and Photographs

Marin moves to suppress evidence of a methamphetamine pipe and photographs obtained on March 1, 2018, during the execution of a search warrant for his barn and residence. Docs. 26, 27. He argues that these items should be suppressed as fruits of a custodial interrogation in the absence of *Miranda* warnings. Doc. 27 at 3-5. Although the Government concedes that Marin's statements were taken in violation of *Miranda*, the exclusionary rule does not apply to "physical evidence that is the fruit of custodial interrogation conducted without *Miranda* warnings." *United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013) (citing *United States v. Patene*, 542 U.S. 630, 642-44 (2004) (plurality opinion); *id.* at 644-45 (Kennedy, J., concurring in the judgment)). Thus, I recommend that Marin's motion to suppress evidence of the methamphetamine pipe and photographs be denied.

### IV.   CONCLUSION

I recommend that Marin's motion to suppress related to the July 19, 2017, traffic stop (Doc. 28) be **denied**. I recommend that Marin's motion to suppress related to his March 1, 2018 arrest (Doc. 26) be **granted in part and denied in part** and that the

16

Government be precluded from introducing evidence of Marin's unwarned statements or cell phones seized on March 1, 2018, as substantive evidence in its case-in-chief.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DATED AND ENTERED** this 26th day of July, 2018.

_Kelly K.E. Mahoney_
Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa