**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>RAUL FLORES MARIN,<br><br>　　　　　Defendant. | No. CR18-4011-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION** |

_____

This matter is before me on a Report and Recommendation (R&R) (Doc. No. 40) in which the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge, recommends that I deny defendant's motion (Doc. No. 28) to suppress based on a July 19, 2017, traffic stop and grant in part and deny in part defendant's motion (Doc. No. 26) relating to his March 1, 2018, arrest. She recommends that I grant that motion (Doc. No. 26) only to the extent that the Government has conceded some evidence should be suppressed. Defendant Raul Flores Marin (Marin) filed timely objections (Doc. No. 51) on August 27, 2018, and the Government filed a resistance (Doc. No. 52) on September 2, 2018.

## I.　　BACKGROUND

### A.　*Procedural History*

On February 21, 2018, the grand jury returned an indictment (Doc. No. 2) charging Marin with one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). On April 27, 2018, Marin filed a motion (Doc. No. 26) to suppress

statements made in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and a motion (Doc. No. 28) to suppress evidence obtained as a result of a traffic stop on July 19, 2017. The Government filed a resistance (Doc. No. 30) to both motions on May 3, 2018. Judge Mahoney held a hearing on May 30, 2018. At the hearing, the Government presented testimony from three law enforcement officers. Doc. No. 36. Judge Mahoney admitted 16 Government exhibits, including video footage of the July 19, 2017, traffic stop. She also admitted one defense exhibit. *Id.* Following the hearing, the parties submitted supplemental briefing regarding the seizure of evidence from Marin's vehicle after his arrest on March 1, 2018. Doc. Nos. 38, 39.

Judge Mahoney issued her R&R (Doc. No. 40) on July 26, 2018. Marin filed his objections (Doc. No. 51) on August 27, 2018. Trial is scheduled to begin November 5, 2018. *See* Doc. No. 44.

## B.   Relevant Facts

Judge Mahoney summarized the following relevant facts in her R&R based on the exhibits and testimony presented during the suppression hearing:

### A.  July 19, 2017

> Sometime after 2:40 a.m. on July 19, 2017, the Osceola County, Iowa Sheriff's Office received an emergency call from Jerry Sievert.[1] Sievert reported a suspicious vehicle, a pickup truck with Minnesota plates, parked in the middle of his yard. He said that he did not know who it was and that nobody had gotten out of the vehicle yet, but they were backing up further onto his property. Ex. 1A. Dispatch sent Deputy Edwards to investigate. Dispatch first provided the incorrect address, a location in the small town of Sibley, Iowa, within minutes of the Sheriff's Office, and Deputy Edwards arrived at the incorrect address around 2:48 a.m. When Deputy Edwards learned that the reporting party was Sievert, he knew the

---

[1] There are some discrepancies in the record as to the correct spelling of Sievert's name as Sievert or Seivert. For purposes of consistency, I will continue using Sievert as Judge Mahoney did in her R&R.

location of the residence (approximately six to seven miles away), as he had been to Sievert's residence in rural Osceola County a few weeks before to investigate another report of a suspicious vehicle. Deputy Edwards also knew that around a month ago, Sievert had reported a burglary of firearms and ammunition from his residence during the daytime.

Deputy Edwards headed to Sievert's residence. He could have taken one of two roads to get to Sievert's residence from town, and he chose to take Nettle Avenue, a gravel road that, like all gravel roads that I am aware of, did not have marked lanes. At 2:53 a.m., when he was still about two miles away from Sievert's residence, Deputy Edwards encountered a Ford F-150 truck traveling northbound on Nettle Avenue (away from the location of the Sievert residence) as he drove southbound (toward the Sievert residence). It was the first vehicle Deputy Edwards had encountered since leaving the Sheriff's Office. As the truck passed, Deputy Edwards slowed and noted it had Minnesota plates. Because the vehicle matched the description of the one Sievert had reported, Deputy Edwards turned around to follow the truck. Deputy Edwards testified that shortly after he began following the truck, it veered onto the left-hand side of the gravel road, almost into the ditch (the dash-camera video is too far away and dark to clearly capture whether the truck was in any danger of leaving the road, although the truck does appear to be traveling on the left-hand side of the road (Ex. 9, 2:53:45-2:54:13)). When Deputy Edwards caught up to the truck (about a mile away from when he first saw the truck), he initiated a traffic stop using his flashing lights. He radioed dispatch Marin's license plate number to run a search.

Deputy Edwards approached the truck and asked the driver, later identified as Marin, what he was up to. Ex. 9, 2:54:48. Marin responded that he was looking for his friend Clint who had sold him a trailer, and he needed the title (although Deputy Edwards misunderstood and believed Marin had been looking for the trailer itself). Deputy Edwards requested Marin's driver's license, registration, and insurance and asked Marin to accompany him to his squad car. As Marin was walking to the car, Deputy Edwards asked if Marin had any knives or guns on his person, and Marin responded (jokingly) something to the effect of "not unless you give me yours." Ex. 9, 2:57:59. Deputy Edwards asked again if Marin had any weapons, and Marin responded in the negative. Deputy Edwards requested to pat Marin down, and after he had patted both of Marin's pockets and was checking lower on his person, Marin told him that he had a Swiss army

knife in his pocket (which Deputy Edwards confiscated along with a lighter).

Once they were in the squad car, Marin asked what Deputy Edwards was doing on Nettle Avenue, as there were not usually law enforcement officers around. Ex. 9, 2:59:40. Deputy Edwards told Marin that he had been called in as a suspicious vehicle when he had been looking for the trailer at the house "back there." Ex. 9, 3:00:04. Marin clarified that he had been looking for the title to the trailer, not the trailer itself. Deputy Edwards responded that either way, Marin had been on Sievert's property when he was not supposed to be, and Sievert had called the Sheriff's Office and given a description of Marin's vehicle.

Around this time, dispatch informed Deputy Edwards that the burglary alarm at a local gas station had been triggered. Because Deputy Edwards was otherwise occupied with Marin and the only officer on duty, he told dispatch to call Deputy Julius to respond to the alarm. Deputy Edwards testified that he recommended dispatch contact Deputy Julius because he is a certified Drug Recognition Expert (DRE), and Deputy Edwards believed Marin may have been impaired based on his observations of Marin and his excited and fast speech. Deputy Edwards asked Marin about past and current drug use, and Marin admitted to using marijuana once many years ago, but he denied any other drug use. Deputy Edwards then obtained Marin's consent to take his pulse. Marin indicated he suffered from high blood pressure, so Deputy Edwards asked Marin his typical heart rate. Marin said that three years ago, it had been 180 to 190 beats per minute, but he now took medication. Deputy Edwards informed Marin that he had measured his pulse at 120 to 125 beats per minute, and Marin said it was usually higher, around 140 to 145 beats per minute.

Deputy Edwards told Marin that he had seen him "going off to the left side of the road" earlier. Ex. 9, 3:09:20. Marin explained that he had been "scared of the cop." Deputy Edwards asked if Marin had thrown something out of the front driver-side window and into the left-side ditch. Marin said no and that the first thing he did when he noticed the squad car following him was to check his speed. Deputy Edwards radioed Deputy Julius for assistance and told Marin that because his pulse was high, he had called a drug recognition expert to the scene to ensure Marin was not intoxicated. While Deputy Edwards waited for Deputy Julius to arrive, he moved Marin to the back of the squad car to wait and talked further with Marin about Sievert and the trailer. Marin indicated he was unsure why

4

Sievert had reported him as a suspicious vehicle because he had been to the residence several times before. At some point, Deputy Edwards shut his vehicle off because he was low on gas and worried about running out (although he ensured that the dashboard camera was still recording).

When Deputy Julius arrived (about twenty minutes after Deputy Edwards had radioed him and thirty-five minutes after the initial stop), one of the first things he asked Marin was whether he had anything illegal in his vehicle. Marin said he had a loaded handgun in the backseat under an article of clothing. Deputy Julius found the firearm where Marin had said it would be (at the same time, Deputy Edwards checked under the passenger seat for firearms and recovered nothing). Deputy Julius checked the serial number of the firearm to see if it was stolen (it was not). Deputy Edwards asked Marin whether he had a permit to carry the firearm, and he did not. Deputy Edwards placed Marin under arrest and took him to jail.

Deputy Julius stayed at the scene with Marin's vehicle and waited for a tow truck. Deputy Julius began the inventory process and found methamphetamine, a large amount of cash ($1,240), and cell phones. The tow truck arrived and took Marin's vehicle to a secure garage, where Deputy Julius completed the inventory. *See* Ex. 6, Doc. 33-4.

### B.   *March 1, 2018*

Agent Elsing stopped Marin while he was driving on March 1, 2018, and arrested him pursuant to a warrant. He seized phones and other evidence from Marin's vehicle after his arrest. Prior to reading his *Miranda* rights, Agent Elsing asked Marin whether he had any drugs at his house. Marin said that he had a methamphetamine pipe in his barn. Based on this statement, Agent Elsing obtained a search warrant for Marin's barn and residence. Ex. 15, Doc. 33-8. As a result, Agent Elsing recovered the methamphetamine pipe and acquired photographs.

Doc. No. 40 at 3-7 (footnotes omitted).

### II.   *STANDARD OF REVIEW*

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### III. DISCUSSION

Marin argues Judge Mahoney erred in finding: (a) Marin was legally stopped, (b) the length of the stop was not unlawfully extended and (c) Marin was not seized nor in

6

custody during his questioning at the scene. He also argues the exclusionary rule should extend to physical evidence obtained as a result of a custodial interrogation without *Miranda* warnings. I will discuss each of these objections separately.

A.  *Legality of the Stop*

Marin argues the Government's interest in investigating an alleged trespass does not outweigh his liberty interest. He notes that Sievert's report did not suggest a threat to public safety or include any indication of an intent to commit a crime. Sievert had identified the individuals he believed were responsible for the prior trespass on his property and Marin was not among them. Finally, he argues Deputy Edwards could have dispelled any concerns by calling Sievert because Sievert knew Marin and could confirm that Marin's friend Clint feeds his cattle at the time Marin was looking for him. *See* Doc. No. 51-1 at 2-3.

Marin relies on *United States v. Hughes*, 517 F.3d 1013 (8th Cir. 2008). In *Hughes*, the court discussed a *Terry* stop in which the only information provided by dispatch was that there were "suspicious parties on the property" in a high-crime area and a description of the parties. *Hughes*, 517 F.3d at 1016. Upon arriving at the scene, the officer identified individuals matching the description provided by dispatch, but did not observe any suspicious behavior. The court analyzed the case as if the officer was investigating a trespass. *Id.* at 1017. It observed that under Missouri law, a trespass, at most, constitutes a misdemeanor. While *Terry* stops are permitted to investigate previous felonies, the court noted the Supreme Court has never decided whether they are permitted to investigate previous misdemeanors. *Id.*

The Eighth Circuit adopted the balancing test used by the Ninth and Tenth Circuits to determine whether a *Terry* stop to investigate a misdemeanor is constitutional. *Id.* This test requires the court to balance the "nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Id.* It noted that the nature of the misdemeanor and potential threats to

citizens' safety are important factors under this test. *Id.* The court concluded that under the facts in *Hughes*, the governmental interest in investigating a previous trespass did not outweigh the defendant's personal interest. *Id.* at 1018.

Judge Mahoney applied *Hughes* and concluded the facts surrounding the trespass in this case implicated a greater risk of danger than in *Hughes*. *See* Doc. No. 40 at 10-13. She distinguished *Hughes* based on the potential safety threat in this case stemming from Deputy Edwards' knowledge of: (1) the prior trespass on Sievert's property, in which the driver had shouted at Sievert to exit his residence and (2) the fact that firearms had recently been burglarized from Sievert's property.[2] *Id.* She also noted that unlike the officer in *Hughes*, Deputy Edwards personally observed suspicious behavior when Marin began driving on the left-hand side of the road after Deputy Edwards turned around to follow him. *Id.* Judge Mahoney summarized the totality of the circumstances supporting the stop as follows:

> Here, considering the totality of the circumstances – (1) that Sievert had reported an unauthorized pickup truck with Minnesota plates on his property; (2) that Deputy Edwards encountered Marin's vehicle in close temporal and physical proximity to the scene, traveling away from Sievert's residence, in a rural area in the middle of the night when no other vehicles were around; (3) that Marin's vehicle matched the description given by Sievert; (4) that Sievert had reported a different suspicious vehicle on his property about a month ago, which had resulted in a confrontation between Sievert and the driver of the vehicle; (5) that in a separate incident about a month ago, firearms and ammunition had been burglarized from Sievert's property; and (6) that Marin's vehicle began driving on the left-hand side of the gravel road near the ditch as soon as Deputy Edwards began following him in a marked squad car – Deputy Edwards had reasonable, articulable suspicion to stop Marin's vehicle and investigate further. *See United States v. Noonan*, 745 F.3d 934, 936 (8th Cir. 2014) (holding that reasonable suspicion to stop the defendant's vehicle existed based on the defendant's driving fifteen miles below the speed limit, his evasive

---

[2] The Government points out these events took place less than a month prior to the traffic stop. *See* Doc. No. 52 at 5 (citing Gov. Ex. 2 (Doc. No. 33) at 4-5). The burglary (during which four firearms and ammunition were stolen) occurred first followed by the trespass two days later. *Id.* Sievert reported that both incidents involved two Hispanic males. *Id.*

8

maneuvers attempting to put distance between his vehicle and a marked squad car, that it was the middle of the night, and that they were near a storage shed when there had been "a rash of recent burglaries" of storage sheds).

*Id.* (internal footnotes omitted).

Having considered the parties arguments, the record and applicable law, I agree with Judge Mahoney's analysis. Deputy Edwards could not have dispelled any concerns about Marin prior to the stop by calling Sievert because Deputy Edwards did not know who was driving the truck at the time he made the stop. Likewise, anything Marin told Deputy Edwards about why he was in the area occurred after the stop and has no bearing on whether Deputy Edwards had reasonable suspicion to justify the stop. Marin has not identified any factors Judge Mahoney failed to consider or any legal basis as to how her analysis is incorrect. I agree with Judge Mahoney's thorough and well-reasoned analysis that based on the totality of the circumstances, Deputy Edwards had a reasonable, articulable suspicion to stop the vehicle and investigate further. This objection is overruled.

### B. *Length of the Stop*

Marin argues Judge Mahoney erred in concluding the length of the stop was not unreasonable. He argues that his mannerisms and fast speech were the result of nervousness and that his high heart rate is the result of his medical condition of high blood pressure. Further, Deputy Julius did not immediately perform a DRE examination when he arrived. He contends the detention extended beyond the time that was necessary to address the basis of the stop – a lane violation and investigation related to the trespass on Sievert's property. *See* Doc. No. 51-1 at 3-4.

Judge Mahoney analyzed the issue as follows:

> Here, Deputy Edwards initially stopped Marin to investigate Sievert's report of a vehicle trespassing on his property, as well as Marin's driving on the left-hand side of the road. Deputy Edwards' initial

9

> questioning aligned with these purposes. As he spoke with Marin, Deputy Edwards observed Marin's odd mannerisms and fast speech, and I fully credit Deputy Edwards' testimony that based on his training, Marin's speech and mannerisms were consistent with drug use. Deputy Edwards also heard Marin's bizarre explanations of his behavior – for example, that Marin was on Sievert's property at 2:45 a.m. to look for the title to a trailer he had purchased from a third party. In addition, Deputy Edwards had earlier observed Marin driving on the left-hand side of the road (almost into the ditch) when Deputy Edwards turned around to follow him. Deputy Edwards thought Marin's driving further indicative of drug use – Marin could have been intentionally driving on the left to attempt to dispose of drugs, or he could have been unintentionally driving on the left because of intoxication. Deputy Edwards had reasonable suspicion to extend the stop to ask Marin about drug use and for consent to take his pulse. Marin's pulse was unusually high, consistent with drug use. Deputy Edwards asked Marin why he had been driving on the left-hand side of the road, and Marin could not give a satisfactory explanation (he said he was scared of cops). These inquiries did not dispel Deputy Edwards' suspicions about Marin's drug use, and he called Deputy Julius to the scene to perform a DRE examination on Marin. When Deputy Julius arrived, Marin had been detained for a total of about thirty-five minutes. Under the totality of the circumstances, reasonable suspicion existed to extend the stop, and the stop was not unreasonably prolonged.

Doc. No. 40 at 14-15. Judge Mahoney also considered Marin's argument that his high heart rate was the result of high blood pressure rather than drug use. She noted that Marin did not tell Deputy Edwards his typical heart rate (other than it had been 180 to 190 beats per minute three years ago, prior to medications) until after Deputy Edwards took his pulse and told Marin the results were high. *Id.* at 14, n. 11.

Marin's objections mirror the arguments raised in his initial motion to suppress. Judge Mahoney fully addressed those arguments in her R&R and I agree with her analysis based on my de novo review. The only issue Judge Mahoney did not address is whether the stop was unlawfully extended because Deputy Julius did not immediately perform the DRE but, instead, asked Marin whether there was anything illegal in the vehicle. *See* Doc. No. 29 at 7; Doc. No. 51-1 at 4. Deputy Julius testified that his question was related to his DRE examination because individuals in impaired driving traffic stops will

sometimes have illegal substances in the vehicle. *See* Doc. No. 45 at 107-08. Of course, once Marin responded that he had a loaded handgun in the backseat, the officers were justified in extending the scope of the traffic stop to determine whether Marin was in lawful possession of the firearm. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) ("An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered."). Marin's objections related to the length of the traffic stop are overruled.

### C. Questioning During the Stop

Marin contends Judge Mahoney incorrectly found that he was not in custody at the time he was questioned. He states he was pat searched and questioned and was not told he was free to leave or that he could abstain from answering questions. He was directed to remain in the back of the squad car while officers possessed his driver's license. He argues these circumstances demonstrate he was in custody requiring *Miranda* warnings. *See* Doc. No. 51-1 at 4-5.

Judge Mahoney noted that Marin was asked if he had any weapons prior to the *Terry* pat-down search and was asked if he used drugs as he sat in the squad car with Deputy Edwards. *See* Doc. No. 40 at 15. She did not find that the circumstances restricted Marin's "freedom of action" to a "degree associated with formal arrest." *Id.* (citing *United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir. 1995)). She reasoned that although Marin was asked about drug use while in Deputy Edwards' squad car, he was "not handcuffed, and prior to searching the ditch (when Marin was moved to the back of the squad car), Deputy Edwards explicitly told Marin he was not under arrest." *Id.* She also cited Eighth Circuit authority addressing similar circumstances in which the court found that an individual subjected to a *Terry* pat-down search or asked to sit in the back of a squad car was not in custody for purposes of *Miranda*. *Id.* at 15-16.

Marin relies primarily on *United States v. Cowan*, 674 F.3d 947, 957-58 (8th Cir. 2012). In *Cowan*, the Eighth Circuit concluded the defendant was in custody because he

11

was detained, handcuffed, and patted down while questioned. *Id*. *Cowan* involved the search of an apartment pursuant to a search warrant. *Id.* at 951. Cowan was found in the apartment and handcuffed. *Id*. He was then frisked and the detective questioned him regarding keys that were found in Cowan's pocket. *Id*.

The presence of handcuffs in *Cowan* and the absence of them in this case is no small difference. *Cowan* relied heavily on *Martinez*, in which the court found the defendant "was in custody at the time he was handcuffed." *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006). While the presence of handcuffs is not dispositive of the custody determination, it is perhaps the most recognizable form of restraint associated with formal arrest. Here, Marin was not handcuffed or restrained to a degree associated with a formal arrest. Indeed, Deputy Edwards told Marin he was not under arrest and, as the Government points out, allowed him to sit in the back seat of the patrol vehicle with the door open and his legs hanging outside. *See* Doc. No. 33-1 at 2; Doc. No. 45 at 73; Gov. Ex. 10 (Deputy Julius' dash cam video). The circumstances remained the same when Julius asked Marin whether there was anything illegal in the vehicle.[3] Doc. No. 45 at 107-08; Gov. Ex. 10. Such a question under the circumstances here does not require a *Miranda* warning. *See United States v. Morse*, 569 F.3d 882, 884 (8th Cir. 2009) (citing *United States v. Martin*, 411 F.3d 998 (8th Cir. 2005) for the proposition that asking a motorist during a traffic stop if there was anything in the vehicle the officer should know about did not require a *Miranda* warning). Based on the totality of

---

[3] It is unclear whether Marin challenges only the questions by Edwards or also Julius' question whether he had anything illegal in the vehicle. Judge Mahoney addressed only Deputy Edwards' questioning. *See* Doc. No. 40 at 15-16. In his objections, Marin appears to challenge both. *See* Doc. No. 51-1 at 5 ("The first thing Deputy Julius did when he arrived, was not perform drug recognition tests, the purported reason for continuing Mr. Marin's detention, but rather asked Mr. Marin if he had anything illegal in his vehicle."). In any event, the circumstances did not change between the time Edwards asked Marin about drug use and Julius asked whether there was anything illegal in the vehicle, beyond the fact that two officers were now at the scene. I do not find that this fact turns the situation into a custodial interrogation requiring a *Miranda* warning.

circumstances, I agree with Judge Mahoney that Marin was not in custody for purposes of *Miranda* when he was asked about weapons prior to the pat-down search, drug use while sitting in the back seat of the squad car and – upon Julius' arrival – whether there was anything illegal in the vehicle. This objection is overruled.

### D. *Application of Exclusionary Rule to Physical Evidence*

Marin argues that the exclusionary rule should be extended to apply not only to statements made as a result of a *Miranda* violation, but also physical evidence. Specifically, he argues that the methamphetamine pipe and photographs obtained from his residence on March 1, 2018, should be suppressed as fruits of a *Miranda* violation.

Judge Mahoney relied on Eighth Circuit law and Supreme Court precedent in analyzing this issue. *See* Doc. No. 40 at 16 (citing *United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013) (citing in turn *United States v. Patene*, 542 U.S. 630, 642-44 (2004) (plurality opinion); *id.* at 644-45 (Kennedy, J., concurring in the judgment))). While I agree with her analysis, I note that the Government has conceded that the methamphetamine pipe should be suppressed in addition to Marin's statements following his March 1, 2018, arrest and the cellphones seized from his vehicle that day. At the hearing, counsel for the Government stated: "[The] Government does not object to the suppression of the meth pipe or any sort of statements provided at the time of the arrest . . . ." Doc. No. 45 at 165. The Government maintained, however, that the seizure and ultimate search of the cellphones recovered from Marin's vehicle that day was appropriate. *Id.* [4]

After the hearing, Judge Mahoney allowed the parties to submit additional briefing on whether the cellphone evidence should be suppressed. *See* Doc. No. 45 at 171. The

---

[4] Judge Mahoney clarified the Government's position asking: "And so to clarify, that would be the motion filed at document number 26, the actual statements and the first search warrant for the residence; correct? The government's conceding those should be suppressed." Doc. No. 45 at 165. The attorney for the Government replied, "Yes, Your Honor." *Id.*

13

Government stated in its supplemental brief that it "does not resist the suppression of the evidence seized by law enforcement at the time of the March 1, 2018, traffic stop." Doc. No. 39 at 3. This would include the methamphetamine pipe and photographs, Marin's statements following his arrest and the cellphones seized from his vehicle. As such, Marin's objection to the R&R on this issue is sustained.

## IV. CONCLUSION

For the reasons set forth herein:

1. Marin's objections (Doc. No. 51) to the Report and Recommendation are **overruled in part** and **sustained in part**. They are **overruled** as to the July 19, 2017, traffic stop and **sustained** as to the March 1, 2018, arrest.

2. I **accept in part** and **decline to accept in part** Judge Mahoney's R&R (Doc. No. 40) as follows:

    a. I **accept** the R&R as to Defendant's motion (Doc. No. 28) to suppress related to the July 19, 2017, traffic stop. Pursuant to Judge Mahoney's recommendation, that motion is **denied**.

    b. I **decline to accept** the R&R as to Defendant's motion (Doc. No. 26) to suppress related to his March 1, 2018, arrest. That motion is **granted.** The following evidence shall be suppressed:

- The methamphetamine pipe and photographs from Marin's residence
- Statements made by Marin following his arrest
- Cellphone evidence obtained from Marin's vehicle following his arrest

**IT IS SO ORDERED.**

**DATED** this 19th day of September, 2018.

                                  _____
                                  Leonard T. Strand, Chief Judge